# In the United States Court of Federal Claims

<table>
<tr><td>

DEBORAH BECKWITH,

                Petitioner,

    v.

SECRETARY OF HEALTH AND HUMAN
SERVICES,

                Respondent.

</td><td>

No. 21-vv-1660
(Filed Under Seal: February 20, 2026
Reissued for Publication: March 9, 2026)[1]

</td></tr>
</table>

*David John Carney*, Green & Shafle LLC, Philadelphia, PA, for Petitioner. With him on the briefs were *Grant Douglas Godfrey*, Mctlaw, Washington, DC, and *Jennifer Anne Gore Maglio*, Maglio Christopher & Toale, P.A., Sarasota, FL.

*Parisa Tabassian*, Torts Branch, Civil Division, United States Department of Justice, Washington, DC, for Respondent. With her on the briefs were *Brett A. Shumate*, Assistant Attorney General, *C. Salvatore D'Alessio*, Director, *Heather L. Pearlman*, Deputy Director, and *Lara A. Englund*, Assistant Director.

## OPINION AND ORDER

Meriweather, Judge.

       Petitioner, Ms. Deborah Beckwith ("Ms. Beckwith"), seeks review of Chief Special Master Corcoran's Entitlement Decision ("Decision"), denying her entitlement to compensation pursuant to the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1–aa-34 ("Vaccine Act"). *See* Decision at 1, ECF No. 67. Ms. Beckwith filed a Petition under the Vaccine Program of the Vaccine Act, alleging the influenza ("flu") vaccine caused her to suffer Guillain-Barré Syndrome ("GBS")—a neurological disorder that can lead to numbness and muscle paralysis. *See* Petition at 1, ECF No. 1. The applicable regulations establish a presumption that the flu vaccine caused GBS if a petitioner proves that she developed GBS between three and forty-two days after receiving the flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(D). Following a dispute about the number and timing of vaccines Ms. Beckwith received, the Chief Special Master determined Ms. Beckwith received one dose of flu vaccine at approximately 2:20 AM on September 24, 2019 and that the onset of her GBS occurred less than three days after vaccination. *See* Order Granting Second Motion for Reconsideration at 2–3, ECF No. 37.

---

[1] Pursuant to Vaccine Rule 18(b)(1)–(2), (d), this Opinion was initially filed under seal on February 20, 2026, and the parties were afforded fourteen days to propose redactions. The parties did not propose any redactions and, accordingly, this Opinion is reissued in its original form for publication.

Accordingly, the Chief Special Master concluded he could not presume causation and Ms. Beckwith had to prove causation-in-fact. The Chief Special Master determined that Ms. Beckwith failed to prove causation-in-fact because she could not establish, by a preponderance of the evidence, "that her GBS developed within a medically-acceptable timeframe after receipt of the flu vaccine." Decision at 21. He therefore denied her Petition. *Id.* at 2.

Ms. Beckwith now seeks review of the Chief Special Master's Decision in this Court, alleging he committed errors of law and made arbitrary and capricious factual findings. *See* Pet'r's Mot. for Review ("Mot."), ECF No. 70; Pet'r's Mem. of Law in Support of Pet'r's Mot. for Review ("Mem."), ECF No. 70-1; *see also* 42 U.S.C. § 300aa-12(e)(1). Ms. Beckwith claims the Chief Special Master: (1) erroneously limited the evidence she could use to prove that the vaccine caused her GBS by treating the timeframe of onset that would support a presumption of causation as a hard and fast rule with an overly narrow exception; (2) failed to properly consider Ms. Beckwith's medical theory of causation when evaluating whether she demonstrated a proximate temporal relationship; (3) applied a heightened standard of proof to Ms. Beckwith's evidence; and (4) arbitrarily and capriciously evaluated Ms. Beckwith's evidence. Mem. at 1. Respondent, the Secretary of Health and Human Services ("the Secretary"), counters that Ms. Beckwith has not shown the Chief Special Master erred. Resp't's Resp. to Mot. for Review ("Resp.") at 1, ECF No. 73.

Having reviewed the record, the parties' legal filings,[2] and the relevant law, the Court **DENIES** Ms. Beckwith's Motion for Review and **SUSTAINS** the Chief Special Master's Decision. The Chief Special Master did not commit an error of law, and Ms. Beckwith's other assertions amount to mere disagreement with the Chief Special Master's well-reasoned factual findings, which is not a basis for overturning his Decision. *See Hines ex rel. Sevier v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1527 (Fed. Cir. 1991).

## BACKGROUND

### I.  Statutory Framework

The Vaccine Act, enacted in 1986, created the National Vaccine Injury Compensation Program, through which claimants can petition to receive compensation for vaccine-related injuries or death. *See generally* 42 U.S.C. § 300aa-10(a). The Act identifies two ways for a petitioner to establish causation and thus qualify for compensation. First, a petitioner may establish that she, after receiving a designated vaccine, suffered an injury listed on the Vaccine Injury Table within the requisite time-period—commonly called a "Table Injury," *see* 42 C.F.R. § 100.3(a)—in which case causation is presumed. *See* 42 U.S.C. § 300aa-11(c)(1). Alternatively, if a petitioner claims entitlement for an injury *not* listed in the Vaccine Injury

---

[2] The following filings are relevant to this Opinion: Petition, ECF No. 1; Mot., ECF No. 70; Mem., ECF No. 70-1; Resp., ECF No. 73. Throughout, page citations to documents in the record refer to the document's original pagination, unless the page is designated with an asterisk (e.g., *1), in which case the reference is to the pagination assigned by PACER/ECF.

Table, *i.e.*, an "Off-Table case," the petitioner must instead prove that the vaccination was the cause-in-fact ("actual causation" or "causation-in-fact") of the vaccinee's asserted injury. *See id.* § 300aa-11(c)(1)(C)(ii)(I), (II). To prove causation-in-fact for an Off-Table case, a petitioner must by a preponderance of the evidence demonstrate: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005). Those three elements are commonly referred to as the "*Althen* prongs." A "failure to establish any one prong is dispositive." *Exum v. Sec'y of Health & Hum. Servs.*, 175 Fed. Cl. 681, 702 (2025).

## II.    Factual Background

The Chief Special Master summarized and evaluated Ms. Beckwith's medical history over the relevant time period, both parties' expert reports, the medical literature submitted, and the relevant legal standards. *See generally* Decision. The Chief Special Master reviewed all the medical records, the medical literature, and the expert reports submitted in this case, but only specifically discussed the records, literature, and reports relevant to his conclusion on the third *Althen* prong in his Decision. *Id.* at 4, 20. This Opinion will briefly summarize the relevant undisputed facts, the expert reports, and the Chief Special Master's determinations.

### A.    Ms. Beckwith's Medical History

Ms. Beckwith was admitted to the Emergency Department at a Department of Veterans' Affairs Medical Center on September 23, 2019. *Id.* at 2 (citing Ex. 3 at 319, ECF No. 6-3). She reported "abdominal pain that had persisted for 11 days" and that she was recovering from an upper respiratory infection ("URI"). *Id.* A doctor diagnosed Ms. Beckwith with "[s]epsis secondary to infection of the common bile duct." *Id.* (citing Ex. 3 at 314, 322). At approximately 2:20 AM on September 24, 2019, Ms. Beckwith received a flu vaccine and experienced no immediate reactions to the vaccine. *Id.* at 2, 12 (citing Ex. 15 at 6, ECF No. 35-1).

Later that day, a doctor referred Ms. Beckwith to a gastroenterologist due to concerns she may be experiencing cholangitis stemming from a prior gallbladder removal. *Id.* at 2–3. The gastroenterologist ordered an endoscopic retrograde cholangiopancreatography ("ERCP"). *Id.* at 3. Ms. Beckwith underwent the ERCP in the afternoon on September 25, 2019, and first reported neurological symptoms that reflected GBS a few hours after the procedure, including "numbness in both hands as well as numbness in both feet," less than two days following her flu vaccine. *Id.* (quoting Ex. 3 at 256). A doctor diagnosed Ms. Beckwith with GBS, Miller-Fisher variant ("MFS")—a "variant of Guillain-Barré syndrome characterized by areflexia, ataxia, and ophthalmoplegia"—on September 30, 2019. *Id.* at 3 & n.4 (citation omitted).

### B.    Procedural History

On August 4, 2021, Ms. Beckwith filed her Petition against the Secretary alleging the flu vaccine caused her to suffer GBS.  Petition at 1.  Initially, Ms. Beckwith asserted that she received three doses of the flu vaccine between September 23 and September 24, 2019, and alleged she was entitled to compensation for a Table injury.  *Id*. at 2.  The Secretary contested Ms. Beckwith's factual record of vaccination and contended that even if Ms. Beckwith received the earliest alleged flu vaccine, her GBS onset occurred too early for a Table injury claim, given the Table's GBS-onset requirement of three to forty-two days after vaccination.  Resp't's Rep. at 7, ECF No. 18.  The Chief Special Master ordered the parties to brief the factual issue of whether Ms. Beckwith's records substantiated any of her vaccinations.  Order, ECF No. 27.  The Chief Special Master then dismissed Ms. Beckwith's Petition for failing to prove she received the flu vaccine on any of the dates alleged.  *See* ECF No. 30.

Ms. Beckwith moved for reconsideration twice and only on her second motion was she able to identify a previously unfiled document confirming one of her alleged vaccinations.  *See* ECF Nos. 31, 36.  The Chief Special Master granted the second motion and determined "that in the early house of [September 24, 2019] (2:20 a.m.), Ms. Beckwith did in fact receive a *single* dose of the flu vaccine."  ECF No. 37 at 2.  However, the Chief Special Master also determined Ms. Beckwith could not pursue a Table injury claim because her GBS-onset occurred less than three days after this vaccination and instead ordered Ms. Beckwith to file an expert report substantiating her alternative off-Table claim.  *Id*. at 2–3.

### C.    Expert Opinions and Medical Literature

#### 1.  <u>Ms. Beckwith's Experts</u>

##### a.  *Dr. Joseph Jeret*

Ms. Beckwith submitted expert reports from Dr. Joseph Jeret, a neurologist, and one of those reports is relevant to the current dispute.  *See* Decision at 4.  Dr. Jeret opined that the onset of Ms. Beckwith's GBS occurred "approximately 36 hours" after her flu vaccination and "that an onset of neurologic symptoms the following day . . . [is] medically acceptable for flu vaccine-caused GBS."  *Id*. at 5 (citing Jeret Rep. at 10, ECF No. 42-1).  The Chief Special Master found Dr. Jeret's medical opinion unpersuasive.  *Id*. at 24–26.

The Chief Special Master reviewed Dr. Jeret's citations to medical and scientific literature but found them unconvincing or irrelevant to establishing a medically acceptable temporal connection between the flu vaccine and GBS in Ms. Beckwith's case.  *Id*. at 4–6, 24–26.  One study "relied on data derived from South Korea's vaccine adverse event compensation program, identifying 48 cases (over a 12-year period) in which individuals were compensated for GBS post-vaccination injuries."  *Id*. at 5 (citing Y. Park et al., *Clinical Features of Post-Vaccination Guillain-Barré Syndrome (GBS) in Korea*, J. Korean Med. Sci. 2017 Jul. 32(7):1154–59, filed as Ex. 45, ECF No. 44-8) ("Park").  The study found GBS "occur[ed] within two days in a bit more than half" of cases."  *Id*. (citing Park at 1156).  The Special Master

concluded the study "does not stand for the proposition that an onset of less than two days has been found to be medically acceptable" because it relies on data from South Korea's equivalent of the Vaccine Program and "could reflect a policy decision." *Id*. at 24.

Dr. Jeret also cited to "a retrospective study of passive surveillance data derived from the Vaccine Safety Datalink" where "researchers observed evidence of [GBS] '[o]nset as early as 1 day after flu vaccination,'" but the Chief Special Master stated it "ma[de] no determination about the relative risk temporally from vaccination." *Id*. at 5 (citing Jeret Rep. at 10). A third paper "relied on data from a pool of Medicare recipients," some of whom "reported [GBS] onset within a few days of [flu] vaccination." *Id.* at 6 (citation omitted). But the Chief Special Master found the paper "did not reach conclusions about more specific questions of temporal risk." *Id*. A fourth article focused specifically on instances of the MFS variant of GBS following several vaccinations, including the flu vaccine. *Id.* But the Chief Special Master determined it did not find an "increase in incidence of [MFS] after vaccination as compared to the general population" and instead merely observed the variant within 2 weeks in 24% of instances. *Id.* (citation omitted). Dr. Jeret contended "onset after 2 days is consistent with this review." *Id*. (citing Jeret Rep. at 10). However, the Chief Special Master found the study "does not stand for the proposition that onset within a day or two of vaccination is as likely as within a week or more." *Id*. at 25.

The Chief Special Master concluded Dr. Jeret "repeatedly identifies literature relying on passive surveillance reports of GBS beginning in a comparably-short timeframe" as Ms. Beckwith's GBS onset, but that the studies "do not opine as to the meaningfulness of these occurrences, for purposes of causation" and reflect only "a temporal association between an adverse event and vaccination." *Id.* at 24 (citing *Campbell v. Sec'y of Health & Hum. Servs*., 97 Fed. Cl. 650, 668 (2011)). The Chief Special Master found the articles "do not provide any reliable basis for concluding that the biologic process necessary" for the flu vaccine to cause GBS "could occur in less than two days." *Id*.

### b. Dr. Omid Akbari

Dr. Omid Akbari, an academic immunologist, submitted two reports in support of Ms. Beckwith's theory of causation. *Id.* at 6. The Chief Special Master found neither report persuasive. *Id.* at 6–9, 25–26. Regarding Dr. Akbari's first report, the Chief Special Master stated that while "prong one causation is not at issue in this case, a brief summary of Dr. Akbari's theory" was necessary, "since it bears on whether Petitioner's GBS began in a medically acceptable timeframe." *Id.* at 7 (citing First Akbari Rep. at 7–17, ECF No. 43-1); *see also id.* at 16–17 (citing *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008)) (noting the "medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement)").

The Chief Special Master characterized Dr. Akbari's theory as "sweeping" and "all-encompassing." *Id*. at 7. He summarized the theory as follows:

> [A] vaccine (a) causes a local reaction, stimulating an immune complex called the "inflammasome," (b) encourages the production of cytokines as well as T "helper

5

cells" that are integral to the process of production of antibodies by B cells, (c) impacts the function of immune regulatory cells that suppress aberrant immune responses, and (d) eventually prompts the creation of antibodies in response.

*Id*. (citing First Akbari Rep. at 7–8). Dr. Akbari also posited that vaccines activate a class of immune cells known as "innate like lymphocytes ('ILLs') that act quickly, and are likely involved []in the induction of demyelinating diseases such as GBS." *Id*. (citing First Akbari Rep. at 10). The Chief Special Master concluded that Dr. Akbari "applied an expansive definition" of the "molecular mimicry . . . accepted as a likely mechanism for GBS," because Dr. Akbari's definition included T helper cell reactions, one of which purportedly "encouraged" the development of GBS. *Id*. (citing First Akbari Rep. at 5–9). The Chief Special Master further stated that Dr. Akbari "claimed that molecular mimicry was accepted despite the difficulty in ever showing an actual mimic." *Id*.

The Chief Special Master was also unconvinced by Dr. Akbari's citations to medical literature to support his opinion that a vaccine-caused onset of GBS within two days of the flu vaccine is medically acceptable. Some of these citations were to the same studies the Chief Special Master found unpersuasive in Dr. Jeret's medical opinion, including the Park study. *Id*. at 7–8. Other citations included a study not specific to GBS that determined the flu vaccine was "likely to encourage a faster immune response" and an article focused on the central nervous system ("CNS"), which "established that T cells could quickly impact the nervous system" and cause demyelination. *Id*. at 8. However, the Chief Special Master noted "GBS is *not* a CNS disease, and so the speed with which [an immune cell] might be thought capable in some instances of moving into, or out of, the CNS does not suggest GBS will occur as quickly as Dr. Akbari posits." *Id.*

In his second report, filed after the Secretary's experts submitted reports, Dr. Akbari maintained "ILLs were known to be fast-acting, could promote production of cytokines and T helper cells, and likely played some role in encouraging 'the development of demyelinating and autoimmune disease,' including acute forms of GBS." *Id*. (citing Second Akbari Rep. at 28, ECF No. 53-2). However, as the Chief Special Master noted, Dr. Akbari acknowledged the "need for greater understanding of ILL function in the hyper-acute phase of inflammation such as vaccination and adverse effects that may occur within hours or few days." *Id*. (citing Second Akbari Rep. at 28). That revealed that "the science on this subject is far less firm than [Dr. Akbari] implied." *Id*. Still, Dr. Akbari "deemed it likely the Petitioner 'possessed a higher number of ILLs,' assuming 'genetic or environmental factors' relevant to her." *Id*. at 9 (citing Second Akbari Rep. at 29). But the Chief Special Master noted such unique genetic or environmental factors were "not substantiated in this case." *Id*. Dr. Akbari concluded it was "plausible" for GBS onset to occur less than two days after vaccination. *Id*. (Second Akbari Rep. at 30).

The Chief Special Master determined that Dr. Akbari's theory "may be biologically correct and/or supported by reliable independent evidence in many respects," but does not "implicat[e] vaccination as an 'x factor' leading to injury, and does not identify with enough reliable specific evidence *where and how* this occurs." *Id*. at 25. Further, while Dr. Akbari "offered *numerous* literature citations, and provided an explanation about how different aspects

of the immune response work (or are speculated to work in some faster contexts—such as with ILLs), his opinion amounted to the contention that it was plausible that GBS could be triggered in a shorter time than commonly understood." *Id*.  The Chief Special Master noted plausibility "is not equivalent to evidence that GBS likely occurs in a day or two of vaccination" and that Dr. Akbari's cited literature "does not constitute a preponderant showing on the timeframe question." *Id*.  Rather, he concluded it "remains *more likely than not* that it takes more than two days for flu vaccine-caused GBS to produce autoantibodies sufficient to result in manifestation of outward, clinically-observable symptoms." *Id*.

### 2. <u>The Secretary's Experts</u>

#### i. *Dr. Peter Kang*

Dr. Peter Kang, a neurologist, submitted an expert report on behalf of the Secretary.  *Id*. at 9.  Dr. Kang "maintained that 'no compelling evidence in the literature' supported the conclusion that the GBS variant experienced by Petitioner could clinically manifest in such a short time frame 'following an immunogenic exposure.'"  *Id*. at 10 (citing Kang Rep. at 16, ECF No. 50-1).  Dr. Kang asserted—and provided literature supporting the conclusion—that the immune response following the flu vaccine takes several days.  *Id*.  He argued Ms. Beckwith displayed GBS symptoms too early "for the vaccine to have been responsible for th[e] antibodies" that drove the development of her GBS.  *Id*.  The Chief Special Master concluded Dr. Kang "relied on what is known about GBS and its autoantibody propagation" to determine it was unlikely the flu vaccine caused Ms. Beckwith's GBS.  *Id*. at 26.  Thus, the Chief Special Master found the medical opinion persuasive.  *Id*.

#### ii. *Dr. William Hawse*

Dr. William Hawse, an academic immunologist, was the Secretary's second expert.  *Id*. at 10.  Dr. Hawse found Ms. Beckwith's GBS onset occurred "within a day of vaccination" and thought "it unlikely GBS could manifest in so short a timeframe."  *Id*. at 10 (citing Hawse Rep. at 11, ECF No. 49-1).  Dr. Hawse maintained ILLs "could be quickly stimulated by vaccination. But the existing scientific and medical literature on the topic was too sparse to conclude either that vaccines likely do stimulate these immune cells, or (and more importantly) that they lead to GBS."  *Id*. at 10–11 (citing Hawse Rep. at 11).  Moreover, he contended that while "there is some inflammasome stimulation attributable to receipt of the flu vaccine," the medical literature does not support the contention that "this stimulation would be sufficiently aberrant to cause a disease process leading to GBS."  *Id*. at 11 (citing Hawse Rep. at 4–5).  On the contrary, certain scientific evidence pointed to the flu vaccine suppressing "some innate responses that would be otherwise pro-inflammatory."  *Id*. (citing Hawse Rep. at 5–6).  Dr. Hawse also opined that Ms. Beckwith's URI and infection-associated sepsis were more reasonable potential causes of her GBS.  *Id*. at 10.

Like Dr. Kang's medical opinion, the Chief Special Master found Dr. Hawse's medical opinion convincing and supported by immunological science.  *Id*. at 26.  The Chief Special Master also noted the Secretary's experts' opinions were both "consistent with the Table timeframe" for GBS onset following the flu vaccine.  *Id*.

### D.      The Chief Special Master's Conclusions

After the parties filed expert reports, the Chief Special Master issued an Order to Show Cause as to why the Petition should not be dismissed for failing to satisfy the third *Althen* prong, which the parties briefed. *See* ECF Nos. 56, 60, 62. The Chief Special Master then issued his Decision denying Ms. Beckwith's Petition for failing to satisfy the third *Althen* prong on August 29, 2025. *See generally* Decision.

The Chief Special Master noted that Ms. Beckwith's medical records "memorialize an onset of neurologic symptoms following the September 25, 2019, ERCP procedure, which included 'ataxia, weakness, pain, areflexia, dysphagia, dysarthria, hypophonia, tremors and sensory deficits in extremities.'" *Id.* at 4 (citing Ex. 5 at 14, ECF No. 6-5). He concluded both parties accept Ms. Beckwith's GBS onset occurred "less than three days" post-vaccination "and the record preponderates in favor of an onset occurring sooner (35 to 40 hours post-vaccination)." *Id.* at 21–22.

The Chief Special Master concluded that Ms. Beckwith "has not preponderantly established that her GBS developed within a medically-acceptable timeframe after receipt of the flu vaccine." *Id.* at 21. He reasoned that "medical science suggests that it is *unlikely*, absent factors specific to a given claimant, that vaccine-caused GBS will occur sooner than *three* days post-vaccination." *Id.* at 26. Rather, "in *most* cases GBS will *more likely than not* take a few days to manifest clinically after an environmental trigger (whether infection or vaccination), given the time it takes for the body to manufacture the pathogenic, cross-reactive antibodies." *Id.* The Chief Special Master acknowledged "Petitioner's experts [] unquestionably vouched for the medical acceptability of a one to two-day onset of GBS post-vaccination," but stated he was not bound by their insufficiently supported assertions and "found the counter-opinions of [Respondent's experts] far more persuasive." *Id.* He determined Ms. Beckwith failed to prove any "special factors," such as "her personal health or other circumstances made a fast onset likely" in her case. *Id.*; *see also id.* at 23 ("The[] facts do not suggest a faster aberrant immune response leading to GBS was more likely in Petitioner's case (no matter how *plausible* it might be), or did occur.").

Ms. Beckwith timely filed her Motion for Review on September 26, 2025. *See* Mot. The Secretary filed his Response on October 24, 2025. *See* Resp.

## STANDARD OF REVIEW

"Under the Vaccine Act, the Court of Federal Claims reviews the decision of the special master to determine if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *de Bazan*, 539 F.3d at 1350 (citing *Althen*, 418 F.3d at 1277); *see also* 42 U.S.C. § 300aa-12(e)(2). In Vaccine Act cases, this Court uses three distinct standards of review—fact findings are reviewed under the "arbitrary and capricious" standard; legal conclusions are reviewed under the "not in accordance with law" standard; and discretionary rulings are reviewed under the "abuse of discretion" standard. *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992) (cleaned up).

8

This Court reviews de novo whether a special master did not act in accordance with the law. *See Althen*, 418 F.3d at 1279. "'Not in accordance with the law' refers to the application of the wrong legal standard." *Rodriguez v. Sec'y of Health & Hum. Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Markovich v. Sec'y of Health & Hum. Servs.*, 477 F.3d 1353, 1356 (Fed. Cir. 2007)). The Court owes "no deference to the . . . special master on questions of law." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1345 (Fed. Cir. 2010).

The standard of review for factual findings is "the most deferential possible." *Munn*, 970 F.2d at 870. The U.S. Court of Appeals for the Federal Circuit has warned against "second guess[ing] the Special Master[']s fact-intensive conclusions," particularly in those cases "in which the medical evidence of causation is in dispute." *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (describing the standard of review as "uniquely deferential for what is essentially a judicial process"). The law is settled that this Court cannot "substitute its judgment for that of the Special Master merely because it might have reached a different conclusion." *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 718 (2009) (cleaned up). Further, a "special master's decision often times is based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen*, 618 F.3d at 1347 (citing *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1362 (Fed. Cir. 2000)). These credibility findings "are virtually unchallengeable on appeal." *Lampe*, 219 F.3d at 1362.

A special master also does not need to "discuss every item of evidence in the record" when making a factual finding "so long as the decision makes clear that the special master fully considered a party's position and arguments on point." *Snyder v. Sec'y of Health & Hum. Servs.*, 36 Fed. Cl. 461, 466 (1996), *aff'd*, 117 F.3d 545 (Fed. Cir. 1997) (citation omitted); *see also Hazlehurst v. Sec'y of Health & Hum. Servs.*, 604 F.3d 1343, 1352 (Fed. Cir. 2010) (noting the Court should presume the special master has considered all the material in the record, regardless of whether she mentions it all). This Court "does not reweigh the factual evidence, [] assess whether the Special Master correctly evaluated the evidence[,] . . . [or] examine the probative value of the evidence or the credibility of the witnesses." *Broekelschen*, 618 F.3d at 1349 (citation omitted).

"If [a] special master has considered the relevant evidence of record, drawn plausible inferences[,] and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines*, 940 F.2d at 1528. Accordingly, this Court should not deem a special master's fact conclusions arbitrary and capricious unless they are "so implausible that [they] could not be ascribed to a difference in view." *Id.* at 1527 (cleaned up). Indeed, if a special master's "conclusion is based on evidence in the record that is not wholly implausible," this Court must "uphold that finding as not being arbitrary or capricious." *Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1338 (Fed. Cir. 2010).

## DISCUSSION

Ms. Beckwith challenges the Chief Special Master's conclusion that she failed to satisfy the third *Althen* prong. *Althen* prong three requires a petitioner to establish a "proximate temporal relationship between the vaccination and the injury." *Paluck v. Sec'y of Health &*

*Hum. Servs.*, 786 F.3d 1373, 1383–84 (Fed. Cir. 2015); *see also Althen*, 418 F.3d at 1278. That requires "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan*, 539 F.3d at 1352 (discussing proof requirements governing claim where special master concluded onset of symptoms occurred too soon to support inference of causation-in-fact). Special masters must conduct a case-by-case analysis of the merits of the petitioner's claim based on the evidence presented in that case. *Althen*, 418 F.3d at 1281; *see also Lampe*, 219 F.3d at 1366; *Davis v. Sec'y of Health & Hum. Servs.*, No. 14-978V, 2022 WL 1654743, *26 (Fed. Cl. Apr. 27, 2022).

As noted above, Ms. Beckwith contends the Chief Special Master erred in four ways. She claims that he: (1) erroneously converted the required onset timeframe for a GBS Table injury into a hard and fast rule regarding the timing of GBS onset for an Off-Table claim; (2) failed to properly consider Ms. Beckwith's medical theory of causation when evaluating whether she demonstrated a proximate temporal relationship between the flu vaccine and her development of GBS; (3) applied a heightened standard of proof to Ms. Beckwith's evidence; and (4) arbitrarily and capriciously evaluated Ms. Beckwith's evidence. Mem. at 1. The Court has considered each of Ms. Beckwith's claims and sustains the Chief Special Master's Decision.

I. **The Chief Special Master Did Not Require Ms. Beckwith's Off-Table Claim to Satisfy the Timing Requirements Governing GBS Onset in Vaccine Injury Table Claims**.

Ms. Beckwith asserts that the Chief Special Master committed an error of law because he purportedly applied a hard and fast three-day GBS onset rule from the Vaccine Injury Table to her Off-Table GBS claim. *See* Mem. at 5, 9. In *Paluck*, the Federal Circuit faulted a special master for applying a "hard and fast deadline" of three weeks for the onset of symptoms allegedly attributable to a vaccine. *Paluck*, 786 F.3d at 1383–84. The Court concluded that the variety of disorders and the paucity of relevant scientific literature made it unreasonable for the special master to require the petitioner to show that symptoms manifested within that strict three-week deadline. *Id.* Ms. Beckwith contends that the Chief Special Master similarly erred by unlawfully requiring her to "overcome the presumption" that GBS onset generally only occurs at least three days after vaccination, as articulated in the Vaccine Injury Table. Mem. at 11–12. The Chief Special Master allegedly limited "the type of evidence and argument" she could submit to showing how "specific facts of [her] medical history or personal circumstances support[ed] a faster onset." *Id.* (cleaned up). Ms. Beckwith contends that she should have been allowed to submit "a new, general medical theory explaining how the immune system may react earlier in outlier cases." *Id.* at 12.

First, the Chief Special Master did not require Ms. Beckwith to prove that her GBS onset occurred at least three days after her flu vaccine, as required for a Table claim, to meet her burden of proof in this Off-Table case. In his Decision, the Chief Special Master stated "the medical science *behind* a Table claim—the raison d'etre for its existence—should not be ignored" and "should still be taken into account to some degree when deciding claims that 'fall out' of the Table." Decision at 22. He explained that the Table "timeframe best captures the most likely period in which flu vaccine-caused GBS would begin, based on the most persuasive

10

and reliable science available when the terms of the Table claim were struck." *Id*. at 23. However, he was clear that "[p]etitioners alleging a non-Table, causation-in-fact flu vaccine-GBS claim are of course not formally limited, in any 'bright line' sense, by the Table's timeframe element." *Id*. at 22. He also acknowledged that a claimant theoretically could establish temporal proximity even if their case presents "a shorter (or longer) onset timeframe than what the Table allows for GBS." *Id*. at 23. He then assessed whether Ms. Beckwith had met her burden to show by a preponderance of the evidence that the onset of GBS less than three days after vaccination was a medically acceptable means of establishing causation in her case. *Id.* at 21–26. Thus, the Chief Special Master did not apply an improper "hard and fast" timeframe like the ruling that *Paluck* overturned. *See Paluck*, 786 F.3d at 1383–84 (finding a special master erred when he stated petitioners "must" show manifestation within a particular timeframe to meet their burden of proof)*; see also Correira v. Sec'y of Health & Hum. Servs.*, 179 Fed. Cl. 286, 298 (2025) (finding a special master erred when he "impose[d] an *inflexible* 'up-to-eight weeks timeframe'" for when it is medically acceptable to infer the flu vaccine caused GBS) (emphasis added).

Second, the Chief Special Master properly articulated the legal standard. He held that where evidence establishing "what about *the specific facts of* [a petitioner's] *medical history* or personal circumstances suggests a faster onset due to vaccination could occur," is lacking, "it is reasonable to find the third *Althen* prong has not been satisfied." Decision at 23. He concluded Ms. Beckwith failed to prove any "special factors," such as "her personal health or other circumstances made a fast onset likely" in her case. *Id*. at 26. In doing so, he appropriately evaluated whether Ms. Beckwith had established a medically acceptable timeframe from which to infer causation "based on the circumstances of the particular case." *Knudsen v. Sec'y of Health & Hum. Servs*., 35 F.3d 543, 548 (Fed. Cir. 1994).

Finally, it was not legal error for the Chief Special Master to consider the Table timeframe for GBS onset when assessing whether the record evidence supported an inference of causation. Neither *Althen* nor this Court's precedent requires special masters to ignore the scientific findings on which the Table's onset time parameters are based. The Chief Special Master referenced the Table and evaluated the entirety of the evidence and medical opinions Ms. Beckwith offered. *See* Decision at 2–14, 21–26.

This Court has repeatedly found similar applications of the third *Althen* prong to be legally proper. For example, in *Flowers*, the Court upheld the Chief Special Master's conclusion that a claimant had failed to establish that the flu vaccine caused GBS where the onset occurred less than three days after her vaccine. *See Flowers v. Sec'y of Health & Hum. Servs.*, 173 Fed. Cl. 613, 629 (2024). The Court cited the Chief Special Master's observation that Flowers "ha[d] not explained how or provided any evidence demonstrating that in this case, in an exception to the generally accepted timeframe for the onset of symptoms, the flu vaccine caused her to experience GBS symptoms less than three days after vaccination." *Id.* Similarly, in *Kindle*, the Court upheld the Chief Special Master's recognition that it was inappropriate to infer causation when the petitioner's GBS onset occurred later than the longest timeframe previously accepted by special masters "where Petitioner had failed to proffer preponderant evidence that such an unusually lengthy post-vaccination onset . . . could still be deemed medically acceptable." *Kindle v. Sec'y of Health & Hum. Servs*., 177 Fed. Cl. 689, 715 (2025) (cleaned up). In *Mager*,

the Court upheld a special master's consideration of the Table as "additional support" for the expert opinions regarding a medically acceptable timeframe for the onset of a seizure disorder. *Mager v. Sec'y of Health & Hum. Servs.*, 166 Fed. Cl. 414, 449 (2023), *appeal dismissed*, No. 2023-2382, 2023 WL 7318303 (Fed. Cir. Nov. 7, 2023).  For the same reasons, the Chief Special Master's recognition that Ms. Beckwith's proposed onset timeframe conflicted with the Table's timeframe was not an error of law.

The Chief Special Master ultimately determined Ms. Beckwith's position was "unsupported by sufficient reliable independent proof" and her expert medical opinions have "reliability issues that [her] evidence did not fully address or refute."  *Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1124 (Fed. Cir. 2025) (quotation omitted).  Specifically, the medical literature Dr. Jeret and Dr. Akbari relied upon showed only "a temporal association" between vaccination and early GBS onset in some cases and did not constitute evidence of causation.  Decision at 24.  Further, the Chief Special Master concluded that the medical science Dr. Akbari cited concerning vaccine-activated fast-acting ILLs and their impact on the development of GBS was insufficiently developed or reliable to satisfy the preponderance of the evidence standard under the third *Althen* prong.  *Id*. at 25 (noting the difference between plausibility and "a preponderant showing").  The Chief Special Master found the Secretary's experts and the evidence they relied upon more persuasive.  *Id*. at 26.  He noted their conclusions were "consistent with the Table timeframe," but his final conclusion did not rely solely on the Table timeframe.  *Id*.  Thus, the Chief Special Master evaluated all the evidence against the proper legal standard when he determined Ms. Beckwith "has not preponderantly established that her GBS developed within a medically-acceptable timeframe after receipt of the flu vaccine."  *Id*. at 21.

## II.     The Chief Special Master Properly Considered Ms. Beckwith's Medical Theory of Causation in Denying Her Claim Under the Third *Althen* Prong.

Ms. Beckwith further contends that the Chief Special Master erroneously failed to fully evaluate her "modified theory of flu-vaccine caused GBS" under the first *Althen* prong and therefore improperly "disregarded the etiology [she] proposed" to satisfy the timing requirement under the third *Althen* prong.  Mem. at 14–15.  However, the Chief Special Master properly recognized that the proposed "medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement)."  Decision at 17 (citing *de Bazan*, 539 F.3d at 1352); *see also Veryzer v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 344, 356 (2011) (noting that "the temporal association must relate to the pathology of the specific medical theory alleged to have caused the injury"), *aff'd per curiam*, 475 F. App'x 765 (Fed. Cir. 2012).  Accordingly, the Chief Special Master evaluated Dr. Akbari's theory of causation, recognizing "it bears on whether Petitioner's GBS began in a medically acceptable timeframe."  Decision at 7.  The Chief Special Master simply found Dr. Akbari's theory unpersuasive and insufficient to meet Ms. Beckwith's burden under the third *Althen* prong.  *Id*. at 24–26.

In evaluating the theory of causation, the Chief Special Master did not, as Ms. Beckwith contends, "cl[ing] to the standard molecular mimicry theory without examining how the innate immune system can trigger symptoms earlier through the inflammasome, ILCs, or ILLs."  Mem.

at 14.  Rather, the Chief Special Master thoroughly reviewed Dr. Akbari's theory and explanations to assess their reliability and credibility.  *See* Decision at 7–8.  The Chief Special Master concluded that although Dr. Akbari "provided an explanation about how different aspects of the immune response work (or are speculated to work in some faster contexts—such as with ILLs), his opinion amounted to the contention that it was plausible that GBS could be triggered in a shorter time than commonly understood."  *Id*. at 25.  "[P]roof of a 'plausible' or 'possible' causal link between the vaccine and the injury . . . is not the statutory standard."  *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010); *see also Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1360 (Fed. Cir. 2019).  Thus, the Chief Special Master properly evaluated how the temporal association Ms. Beckwith proposed under the third *Althen* prong "relate[d] to the pathology of the specific medical theory alleged to have caused the injury."  *Veryzer*, 100 Fed. Cl. at 356.  He did not commit an error of law.  As further discussed below, Ms. Beckwith's other issues with the Chief Special Master's evaluation of Dr. Akbari's medical theory amount to mere disagreement with the Chief Special Master's credibility determinations and factual conclusions, which this Court cannot second guess.  *See Hines*, 940 F.2d at 1527.

### III.    The Chief Special Master Did Not Raise Ms. Beckwith's Burden of Proof.

Ms. Beckwith next argues that the Chief Special Master erroneously "required [her] prong 3 evidence to show that early onset was not legally probable, but scientifically or medically certain, and required demonstration of a specific mechanism and a generally accepted medical theory to establish a proximate temporal relationship."  Mem. at 16.  Ms. Beckwith contends this amounted to "requiring Ms. Beckwith to prove a Table revision is needed, rather than that the vaccine was likely a substantial factor in her illness."  *Id*. at 17.  Further, she asserts that the Chief Special Master's requirement she "explain the *where and how* of causation constitutes a requirement of proof of mechanism, which is erroneous."  *Id.* (citing *Althen*, 418 F.3d at 1280).  But the Chief Special Master did not err.  Throughout his Decision, the Chief Special Master "clearly articulated and applied the 'more likely than not' standard" to the third *Althen* prong.  *White v. Sec'y of Health & Hum. Servs*., No. 2024-1372, 2025 WL 3703259, at *5 (Fed. Cir. Aug. 27, 2025); *see* Decision at 21–26.  Based on the record, he concluded "Petitioner cannot show by preponderant evidence that her GBS began in a medically-acceptable timeframe."  Decision at 26; *see also id.* at 23 (finding the "facts do not suggest a faster aberrant immune response leading to GBS was more likely in Petitioner's case (no matter how *plausible* it might be), or did occur for the reasons alleged").

The Chief Special Master did not require scientific or medical certainty anywhere in his Decision.  Nor did he require Ms. Beckwith to prove causation through "definitive statements of causation and epidemiological certainty" so clear as to require that the Vaccine Table be revised.  *Campbell*, 97 Fed. Cl. at 673.  When evaluating Ms. Beckwith's medical opinions and the underlying scientific literature, the Chief Special Master consistently differentiated evidence indicating "GBS *could* occur in less than two days" after vaccination—a mere temporal connection—from Ms. Beckwith's burden to show it was "*more likely than not*" her GBS onset occurred in a medically acceptable timeframe to infer the flu vaccine *caused* the injury.  *See* Decision at 24–26; *see also Moberly*, 592 F.3d at 1322 (differentiating between a "more likely that not" standard and "proof of a 'plausible' or 'possible' causal link between the vaccine and

13

the injury, which is not the statutory standard"). He properly weighed the evidence, in line with his authority as the factfinder, to determine its relevance and sufficiency for meeting Ms. Beckwith's burden of proof. *See Bradley v. Sec'y of Health & Hum. Servs.,* 991 F.2d 1570, 1575 (Fed. Cir. 1993). As discussed above, he properly considered the Table timeframe along with Ms. Beckwith's evidence but ultimately found Ms. Beckwith failed to show that "her personal health or other circumstances made a fast onset likely" in her particular case. Decision at 26; *see also Mager*, 166 Fed. Cl. at 449 (finding it is proper for a special master to consider the Table timeframe as "additional support"). Thus, he evaluated her claim of causation in fact "based on the circumstances of the particular case." *Knudsen*, 35 F.3d at 548.

Nor is the Chief Special Master's conclusion that Dr. Akbari's theory "does not identify with enough reliable specific evidence *where and how*" Ms. Beckwith's vaccination led her to her GBS onset equivalent to an improper requirement of proof of mechanism. *See* Decision at 25. The Chief Special Master did not inappropriately "require identification and proof of specific biological mechanisms" to satisfy the third *Althen* prong. *See Althen,* 418 F.3d at 1280 (citing *Knudsen,* 35 F.3d at 549). Rather, the Chief Special Master properly evaluated Dr. Akbari's opinion and the underlying evidence about fast-acting ILLs to determine whether it was sufficiently credible and reliable for Ms. Beckwith to establish medical acceptability. *See* Decision at 25. The Chief Special Master did not fault Ms. Beckwith for failing to provide proof of specific biological mechanisms relating to ILLs. Instead, the Chief Special Master concluded the theory Dr. Akbari offered only showed it was "plausible that GBS could be triggered in a shorter time than commonly understood," while acknowledging "need for greater understanding" of how ILLs may contribute to that process. *Id.* at 8, 25–26. The Chief Special Master correctly differentiated such evidence from a showing it is "*more likely than not*" true that in Ms. Beckwith's case flu-vaccine-triggered ILLs caused her GBS in less than two days. *Id*. at 25–26; *see Moberly*, 592 F.3d at 1322.

## IV. The Chief Special Master's Factual Findings Were Neither Arbitrary Nor Capricious.

Finally, Ms. Beckwith asserts that the Chief Special Master's assessment of the evidence was arbitrary and capricious, and he failed to articulate a rational basis for his Decision. *See* Mem. at 18. She contends the Chief Special Master irrationally and implausibly evaluated the scientific literature, improperly considered other potential causes of her GBS, ignored evidence that overlapped with her causation theory under the first *Althen* prong, and improperly weighed her evidence "against the Table" instead of "against the *Althen* requirements." *Id*. at 18–20. But Ms. Beckwith does not provide any basis for this Court to doubt the Chief Special Master's factual conclusions, which this Court must consider with special deference. *Hodges*, 9 F.3d at 961; *see also Munn*, 970 F.2d at 870 (noting the standard of review for factual findings is "the most deferential possible").

The record does not indicate that the Chief Special Master considered the scientific literature irrationally or drew implausible conclusions. The Chief Special Master, within his purview as the factfinder, considered all the scientific and medical literature Ms. Beckwith submitted but found it unpersuasive. *See* Decision at 4–9, 23–26; *Hines*, 940 F.2d at 1528. He rationally determined that the studies upon which her experts relied did not make sufficient

14

findings about causation and merely showed a temporal connection between the flu vaccine and GBS.  *See, e.g.*, *id*. at 5 (finding one study "ma[de] no determination about the relative risk temporally from vaccination"), 6 (determining another study "did not reach conclusions about more specific questions of temporal risk"), 25 (referencing a study that "does not stand for the proposition that onset within a day or two of vaccination is as likely as within a week or more"); *see also Campbell*, 97 Fed. Cl. at 668 ("Case reports do not purport to establish causation definitively, and this deficiency does indeed reduce their evidentiary value compared particularly to formal epidemiological studies.").  He also reasonably determined that the Park study, which only documented payouts under the South Korean equivalent of the Vaccine Program, "could reflect a policy decision" and was not sufficiently probative of whether it is medically acceptable to infer the flu vaccine can cause GBS in less than two days.  Decision at 24.[3]  Further, he rationally discounted a study about the CNS, because "GBS is *not* a CNS disease."  *Id*. at 8.  Ms. Beckwith would prefer that this Court reevaluate the scientific and medical literature to reach a different conclusion.  But this Court cannot do so, particularly since this is a case "in which the medical evidence of causation is in dispute."  *Hodges*, 9 F.3d at 961; *see also Snyder*, 88 Fed. Cl. at 718.

The Chief Special Master also did not err when he speculated, without deciding, about other potential causes of Ms. Beckwith's GBS.  While the Chief Special Master noted that her ERCP or her URI may have been other reasonable causes of her GBS, *see* Decision at 23 n.16, he only did so to illustrate Ms. Beckwith's failure to meet her burden to establish it was medically acceptable to infer the flu vaccine caused her GBS.  *Id*. at 23.  And to the extent Ms. Beckwith now takes issue, for the first time, with the Chief Special Master's failure to assess whether her URI acted synergistically with the flu vaccine to cause her GBS, *see* Mem. at 12, she waived this argument by failing to raise it below.  *See Austin v. Sec'y of Health & Hum. Servs*., 818 F. App'x 1005, 1008 (Fed. Cir. 2020) (A petitioner "cannot fault the Special Master for not considering a piece of evidence she never presented to him"); *McCollum v. Sec'y of Health & Hum. Servs*., 135 Fed. Cl. 735, 741 (2017) ("The Special Master cannot be expected to, *sua sponte*, apply a legal theory that petitioner did not himself raise," as this would "shift the burden of proof from the petitioner to the Special Master himself."), *aff'd*, 760 F. App'x 1003 (Fed. Cir. 2019).

Further, the Chief Special Master did not ignore the evidence Ms. Beckwith submitted under the first *Althen* prong.  He did not discuss every piece of evidence in his Decision but stated that he reviewed all the evidence submitted in this case.  *See* Decision at 20.  A special master need not "discuss every item of evidence in the record" when making a factual finding "so long as the decision makes clear that the special master fully considered a party's position and arguments on point."  *Snyder*, 36 Fed. Cl. at 466.

---

[3] Contrary to Ms. Beckwith's suggestion, the Chief Special Master did not unreasonably change his mind about the Park study; he similarly found in a previous case that "Park is not entitled to great weight for the reliability of its medical findings" when rejecting a petitioner's claim under the third *Althen* prong.  *Block v. Sec'y of Health & Hum. Servs*., No. 19-969V, 2021 WL 5709764, at *4 (Fed. Cl. Spec. Mstr. Oct. 29, 2021).

Nor did the Chief Special Master irrationally evaluate Ms. Beckwith's causation theory when denying her claim under the third *Althen* prong. As noted above, the Chief Special Master thoroughly considered Dr. Akbari's theory of causation and his view that flu vaccine-induced ILLs can cause GBS onset within two days of vaccination, but simply found it lacked a reliable scientific basis. Decision at 25 (finding Dr. Akbari's theory "founders [sic] in implicating vaccination as an 'x factor' leading to injury" and is "inadequately bulwarked with sufficient reliable evidence"); *see also Moberly*, 592 F.3d at 1324 ("Although a Vaccine Act claimant is not required to present proof of causation to the level of scientific certainty, the special master is entitled to require some indicia of reliability to support the assertion of the expert witness."). The Chief Special Master noted that even Dr. Akbari acknowledged the shortcomings in available literature, which meant "the science on this subject is far less firm than [Dr. Akbari] implied." Decision at 8. The Chief Special Master drew rational and plausible conclusions from the evidence. Thus, this Court cannot "reweigh the factual evidence, [] assess whether the Special Master correctly evaluated the evidence[,] . . . [or] examine the probative value of the evidence." *Broekelschen*, 618 F.3d at 1349 (citation omitted).

The Chief Special Master also properly weighed Dr. Akbari's opinion against the opinions of the Secretary's experts, who disagreed that it was medically acceptable to infer Ms. Beckwith's flu vaccine caused her GBS onset, given how quickly it occurred in her case. Decision at 26. He found the Secretary's experts relied on robust evidence and were more persuasive. *Id*. The Chief Special Master's conclusion was "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen*, 618 F.3d at 1347 (citing *Lampe*, 219 F.3d at 1362). It is not appropriate for this Court to second-guess his determinations about the persuasiveness of competing expert theories, *id.*, which "are virtually unchallengeable on appeal." *Lampe*, 219 F.3d at 1362.

The Chief Special Master also noted that the Secretary's experts' theories were aligned with the Table, *see* Decision at 26, but he did not, as Ms. Beckwith claims, weigh her evidence against the Table. *See* Mem. at 20. Along with the competing expert theories and medical literature, the Chief Special Master appropriately considered the science behind the onset requirement for the GBS Table injury, *see Flowers*, 173 Fed. Cl. at 628–29, and his own extensive experience with GBS cases. *See Ultimo v. Sec'y of Health & Hum. Servs.*, 28 Fed. Cl. 148, 152–53 (1993); *Doe v. Sec'y of Health & Hum. Servs.*, 76 Fed. Cl. 328, 338–39 (2007). He rationally weighed the competing evidence and concluded Ms. Beckwith failed to meet her burden, under *Althen*, to show by a preponderance of evidence that it was medically acceptable to infer the flu vaccine caused her GBS onset in less than two days. Decision at 26. Since the Chief Special Master's Decision "is based on evidence in the record that is not wholly implausible," this Court is "compelled to uphold that finding as not being arbitrary or capricious." *Cedillo*, 617 F.3d at 1338.

**CONCLUSION**

For the reasons articulated above, Ms. Beckwith's Motion for Review, ECF No. 70, is **DENIED** and the Chief Special Master's Decision, ECF No. 67, is **SUSTAINED**.  The Clerk of the Court shall enter Judgment for Respondent accordingly.

Date: February 20, 2026

ROBIN M. MERIWEATHER
Judge